# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

ALBUQUERQUE PUBLIC SCHOOLS
BOARD OF EDUCATION,

      Respondent-Appellant,

v.                                      Case No. 1:21-cv-00396 WJ-JHR

CLAIRE & DANIEL ARMSTRONG,
as Parents of D.A., Student (a minor),

      Petitioners-Appellees.

## MEMORANDUM OPINION AND ORDER ON APS'S BRIEF IN CHIEF (DOC. 15)

THIS MATTER comes before the Court pursuant to a Brief in Chief (Doc. 15) from Respondent-Appellant Albuquerque Public Schools ("APS"). APS seeks to appeal the decision of the due process hearing officer ("DPHO") who found, in part, for Petitioners-Appellees ("Parents") at the due process hearing held pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*, in January 2021. Having reviewed the parties' submissions, the record, and the applicable law, the Court finds that the DPHO correctly decided the issues before her. Accordingly, the Court **AFFIRMS** the DPHO's decisions.

## BACKGROUND

The focus of this case is a child, D.A., who is currently a seventh-grade student at Wilson Middle School. (Doc. 1-1 at 5; Doc. 21 at 2). Before his time at Wilson, he attended Bandelier Elementary School. (Doc. 1-1 at 18). Both schools are part of the Albuquerque Public School (APS) district. The statutory period in this case is from October 8, 2018, to October 8, 2020. D.A. was in fourth grade on October 8, 2018 and sixth grade on October 8, 2020. *See, e.g.*, Doc. 19 at 3, 16, 43, 71 (IEPs for D.A.'s third, fourth, fifth, and sixth grade school years).

D.A.'s parents observed his struggles with pre-reading and reading skills as early as first grade. *Id.* at 5. When D.A. was in second grade, APS's eligibility determination revealed that he had characteristics of dyslexia, a neurobiological disability that causes reading and spelling difficulties. *Id.* at 5–7. D.A. had an IEP from third through sixth grade, updated regularly, to address his academic difficulties. *See generally* Doc. 19 at 3–83 (IEPs for different years).

Various issues have arisen throughout D.A.'s time in elementary and middle school. His reading has not made consistent improvements, he still struggles with writing and spelling, and for some time in sixth grade he was failing his math class before finally achieving a D- grade. *See, e.g.*, Doc. 19 at 4, 17–18, 45, 525 (indicating continuing reading struggles); *id.* at 215 (indicating math grade); DPH Transcript at 451 (longest written work completed on his own in fifth grade was a single paragraph).[1] This lack of progress led to a due process hearing pursuant to the IDEA. The parties identified sixteen issues to be resolved at the hearing:

1. Whether Student was provided specialized reading instruction, based on peer-reviewed research, to meet his unique needs as a student with a reading disability including characteristics of dyslexia;
2. […]
3. Whether Student was provided education which met State standards;
4. Whether Student was provided audio texts through Bookshare or Learning Ally to allow access to the general curriculum, and independent learning and reading;
5. Whether APS implemented Student's Individualized Education Plans ("IEPs");
6. Whether Student was timely and consistently provided Assistive Technology ("AT") sufficient to meet his unique needs;
7. Whether Student utilized the technology made available to him by the District in the manner he was instructed by the District AT personnel;
8. Whether IEP goals were designed to meet Student's needs that result from his disability, and to enable him to be involved in and make progress in the general education curriculum;
9. Whether APS appropriately measured Student's progress toward goals through reliance on iReady;
10. […]
11. […]
12. […]

---

[1] Doc. 18 at 742.

13. Whether Student's IEP teams included staff who could interpret the instruction implications of evaluation results and who had specialized expertise in dyslexia and evidence based reading instruction as well as Tourette Syndrome / Tic Disorders;[2]

14. Whether APS failed to provide Parents with Prior Written Notice ("PWN") about the Local Educational Agency's ("LEA's") rejection of their requests for specialized reading instruction. (The LEA is the generic name for the school district – in this case, the LEA is APS or the District.);

15. And whether any of the actions and inactions of APS denied Student a free and appropriate public education ("FAPE");

16. Whether Student is entitled to equitable remedy and what that remedy should be.

(Doc. 1-1 at 1–2). The DPHO thoroughly considered the questions after a five-day hearing in January 2021. *Id.* at 1. She ultimately ruled in favor of Parents for Issues 1, 3–9, 13 in part, and 14; these findings led to rulings for the parents in Issues 15 and 16, which by their nature depended on the findings in the first fourteen issues. *Id.* at 53–56. APS appeals the findings of fact and conclusions of law related to Issues 1, 3–9, 13, and 14—all the rulings in Parents' favor.[3]

## LEGAL STANDARD

Congress enacted the IDEA with the purpose of ensuring a free appropriate public education (FAPE) to all children with disabilities. 20 U.S.C. § 1400(d)(1)(A). The IDEA allows parents an impartial due process hearing if they allege that a school district fails to provide their student a FAPE. *Id.* § 1415(f)(1)(A). If the hearing is conducted by a local educational agency— for example, a school district—an aggrieved party may appeal to the state educational agency. *Id.* § 1415(g)(1). Appeals from state agency decisions, whether the state agency was the first to decide the issue or took it up on appeal, may take place in a state or district court within ninety days of the DPHO's decision. *Id.* § 1415(i)(2).

When a district court considers the case on appeal, it applies a "modified *de novo* standard." *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008). That is,

---

[2] No issues regarding Tourette's Syndrome or any tic disorder were raised on appeal. Additionally, the DPHO refers to the IEP team's qualifications with Assistive Technology when ruling on this issue. *See* Doc. 1-1 at 54.

[3] APS does not appeal the other issues (Issues 2 and 10–12), so the Court does not address them here.

while the statute requires *de novo* review, the district court must give "due weight" to the findings in the administrative proceedings; these factual findings are "considered *prima facie* correct." *Id.* (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982) and *L.B. ex. rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966 (10th Cir. 2004)).

"The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005). The challenger must demonstrate by a preponderance of the evidence that the school has denied the student a FAPE. *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148–49 (10th Cir. 2008). The Supreme Court has held that the "adequacy of a given IEP turns on the unique circumstances of the child for whom it was created," which is a standard incompatible with "bright-line rule[s.]" *Endrew F. ex rel Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017). Nonetheless, the Court has stated that in general, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

Following a finding of an IDEA violation, a DPHO or court may fashion equitable relief. *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1128 (10th Cir. 2008). If the violation is solely procedural in nature and did not cause a substantive deprivation of a FAPE, an order requiring prospective compliance may be appropriate, whereas for a substantive violation resulting in denial of a FAPE, compensatory education is an appropriate remedy. *Id.* at 1125–26.

## DISCUSSION

The Court's task is to review the DPHO's decisions under the modified *de novo* standard outlined above. APS's Brief in Chief (Doc. 15) addresses four issues: the school's choice of

educational methodology, D.A.'s attendance record, the school's provision of assistive technology, and school's overall provision of a FAPE.

## I.   Educational Methodology

The DPHO found that "the District failed to provide [D.A.] with necessary specialized instruction, based on research, to meet his individual needs in reading, writing, and spelling." (Doc. 1-1 at 39). D.A. was taught using the SPIRE program;[4] the parties disagree about the propriety of this method for teaching dyslexic students to read, but the DPHO stated that Parents "failed to prove, by a preponderance of the evidence, that [D.A.] could not learn to read relying on SPIRE." *Id.* at 43. Parents did not prove that SPIRE was per se ineffective as a methodology, but they did prove that D.A.'s teachers "failed to provide SPIRE instruction, or any reading instruction, with fidelity." *Id.* at 43–44. The Court agrees with both of these findings.

### A.   Adequacy of the SPIRE Program Generally

To begin, APS argues—in accord with the DPHO's finding—that the SPIRE program itself is an acceptable methodology and that parental preference for a different program does not, in and of itself, indicate that the school's chosen program constitutes denial of a FAPE. (Doc. 15 at 7–8; Doc. 22 at 4–5). Confusingly, APS makes this argument even though the DPHO already found for them in this respect; the Court notes that since APS has only challenged the DPHO's findings for Parents, this question does not appear to be before the Court on appeal.

However, to the extent (if at all) that the issue is properly before the Court, the Court agrees with the DPHO. Although Parents brought evidence that various teachers did not have any experience teaching reading to dyslexic children, and that SPIRE may not be optimal at teaching dyslexic children to read in groups, they did not prove by a preponderance of the evidence that the

---

[4] The record stylizes "SPIRE" in all capital letters, but the briefing does not note whether it is an acronym.

SPIRE program is ineffective at teaching dyslexic children to read at all. *See* DPH Transcript at 707–08 (D.A.'s sixth grade SPIRE teacher does not know if SPIRE is geared toward students with dyslexia), 887–88 (Parents' expert states that SPIRE is not designed to teach dyslexic students "unless it's done one-on-one"); 1152 (special education reading liaison and certified dyslexia therapist Ms. Fox testifies that SPIRE can teach dyslexic students to read "if it's delivered in the manner that it's meant to be" which is "consistently four to five days a week in small groups, six to eight students preferably").[5]

### B. Adequacy of the SPIRE Program as Implemented

Moving beyond the adequacy of the program itself, the DPHO found that the education actually provided to D.A. was not a FAPE, even though SPIRE could have constituted a FAPE if it had been implemented effectively. (Doc. 1-1 at 43–44). APS disagrees and asserts that D.A. made adequate progress in his program, implying that his teachers provided him adequate instruction. (Doc. 15 at 4). APS cites broadly to the testimony of Mr. Ross and Ms. Francis. The Court first addresses D.A.'s progress, then discusses whether APS has implemented the SPIRE program with fidelity notwithstanding D.A.'s lack of progress.

### 1. D.A.'s Progress

Mr. Ross and Ms. Francis did indicate that D.A.'s reading had improved. Ms. Francis, at the time of the hearing, was a special education cross-category teacher for third and fourth graders at Bandelier Elementary School, and she had D.A. in her classroom during his third-grade year. *Id.* at 1033, 1037.[6] She testified that when he entered her class, D.A. was at a Level 1 in SPIRE and struggled to spell his name. *Id.* at 1037.[7] By the time he left her class to begin the fourth grade,

---

[5] Doc. 18 at 998–99, 1178–79, 1443.
[6] Doc. 18 at 1324, 1328.
[7] Doc. 18 at 1328.

"his writing did improve in the sense that it wasn't just letter strings," and he "was able to spell his last name," but he still struggled with "rate and smoothness" in fluent reading aloud. *Id.* at 1041.[8] D.A.'s third grade year is not part of the statutory period; this information is therefore useful only inasmuch as it gives context for D.A.'s education during the statutory period.

Meanwhile Mr. Ross, who at the time of the hearing was still in the process of obtaining certification to teach special education classes, was D.A.'s SPIRE reading teacher at Wilson Middle School. DPH Transcript at 682–83, 689.[9] He testified that D.A. was part of the Level Six SPIRE group even though he had pre-tested into approximately a Level Four due to the need to place children in the closest group available to their level. *Id.* at 695, 699.[10] Mr. Ross stated that throughout the sixth-grade year up to the time of the hearing in January, D.A. had been "doing fine" in reading and SPIRE and that the class may have been "too easy for him" because he "might have been bored in class." *Id.* at 703–04.[11] On the other hand, Mr. Ross also testified that he believed D.A.'s grades in literacy strategies were an A during first quarter, but a D during second quarter, and a D for the semester as a whole. *Id.* at 709–10.[12]

Any progress D.A. made does not appear to be consistent and his test scores indicate a lack of meaningful improvement. D.A. was at Level One in SPIRE from the beginning of third grade (August 2017) to February 2018 of his third grade year. DPH Transcript at 1091–92.[13] According to his IEP, D.A.'s SPIRE pre-assessment in August of 2019, at the beginning of fifth grade, was a Level Four. (Doc. 19 at 45). He once again tested into Level Four at the start of sixth grade despite being in Level Four for all of fifth grade. DPH Transcript at 695, 699.[14] His SPIRE levels therefore

---

[8] Doc. 18 at 1332.
[9] Doc. 18 at 973–74, 980.
[10] Doc. 18 at 986, 990.
[11] Doc. 18 at 994–95.
[12] Doc. 18 at 1000–01.
[13] Doc. 18 at 1382–83.
[14] Doc. 18 at 986, 990.

do not indicate consistent improvement. Even more troubling are D.A.'s iReady reading scores

throughout the years. The Court has compiled the following chart from D.A.'s IEPs.

| Grade | Test Date/Time of Year | iReady Test Score |
|---|---|---|
| 3 | 8/2017 | 409 (kindergarten reading level) |
| 3 | 12/2017 | 431 (first grade reading level) |
| 3 | 3/2018 | 465 (first grade reading level) |
| 4 | Fall 2018 | 405 (kindergarten reading level) |
| 4 | Winter 2019 | 419 (first grade) |
| 4 | Spring 2019 | 618 (**invalidated** because teacher read assessment aloud for D.A.) |
| 5 | Fall 2019 | 501 (third grade reading level) |
| 5 | Winter 2019–20 | 427 (first grade reading level) |
| 5 | Spring 2020 | **No testing issued due to pandemic** |
| 6 | 10/16/2020 | 606 (sixth grade reading level) (**educational assistant read portions of the test to D.A.**, DPH Transcript at 1130–31[15]) |
| 6 | 1/4/2021 | 463 (first grade reading level; **flagged as unreliable**, new assessment scheduled) |
| 6 | Winter Retest | **Deemed unreliable** because educational assistant read test to D.A. (Doc. 1-1 at 16). |

*See* Doc. 19 at 4, 17–18, 45, 525.[16] In the Court's view, these stagnant and unreliable test scores,

alongside halting SPIRE level improvements, do not demonstrate that D.A. was making progress

in his reading skills. The Court therefore rejects APS's argument that D.A. made adequate progress

under the reading program outlined by his IEP.

### 2.  *APS's Implementation of the SPIRE Program with Fidelity*

It is possible that APS provided a FAPE if the IEP it created for D.A. was "reasonably

calculated to enable [D.A.] to make progress appropriate in light of his circumstances." *Endrew*

*F.*, 137 S. Ct. at 999. SPIRE, when "delivered in the manner that it's meant to be," involves

---

[15] Doc. 18 at 1421–22.

[16] The Court notes that the DPHO's findings mix up a few of the scores compared to the information memorialized in D.A.'s IEPs. *See* Doc. 1-1 at 16. The scores in the chart above reflect the information from the IEPs. The differences are minor, and in the Court's view, the DPHO's general finding—that D.A.'s scores have been unreliable and do not demonstrate improvement—remains reliable.

instruction that takes place "consistently four to five days a week in small groups, six to eight students preferably." DPH Transcript at 1152.[17] APS failed to provide D.A. with SPIRE education in this manner. Furthermore, it has not offered "a cogent and responsive explanation for [its] decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S. Ct. at 1002.

As the DPHO notes, many irregularities occurred. SPIRE group sizes varied. *Id.* at 490 (fourth grade SPIRE class of twelve total, split into two groups), 607–08 (fifth grade SPIRE class of ten to fourteen, no educational assistant in class).[18] D.A.'s fourth grade SPIRE records were destroyed, making it difficult to know the learning conditions and D.A.'s level of understanding. *See id.* at 485, 495–96.[19] Fourth grade SPIRE instruction took place only two to three days per week. *Id.* at 489.[20] In fifth grade, D.A. received no SPIRE instruction whatsoever from March 2020 to the end of that school year due to the pandemic. *Id.* 497–98.[21] In sixth grade, D.A. was placed in a Level Six SPIRE group even though he pre-tested only to Level Four that year. *Id.* at 695, 699.[22] The Court is troubled by these irregularities in implementation of the SPIRE program, particularly in the case of a child who has struggled with reading for years and his teachers knew about his struggles.

Accordingly, the Court **AFFIRMS** the DPHO's decision regarding Issues Number 1 (APS denied specialized reading instruction), 5 (APS did not implement IEP), and 9 (APS did not appropriately measure D.A.'s progress toward goals through reliance on iReady).

---

[17] Doc. 18 at 1443. Notably, this witness—Ms. Fox—also stated that she has "seen students who require smaller group instruction than six to eight students." *Id.* at 1449.
[18] Doc. 18 at 781, 898–99.
[19] Doc. 18 at 776, 786–87. However, Ms. Hurd testified that she believes D.A. "passed every concept [in SPIRE in fourth grade] with 80 percent or higher accuracy." *Id.* at 785.
[20] Doc. 18 at 780.
[21] Doc. 18 at 788–89.
[22] Doc. 18 at 986, 990.

### C. Compliance with State Standards

Since 2010, New Mexico state law has had requirements for the education of students with dyslexia. These standards, at the start of the statutory period (October 8, 2018) included the following: "School districts and charter schools shall train special education teachers to provide appropriate specialized reading instruction for students who are identified with dyslexia as a specific learning disability and who are eligible for special education services." NM Session Laws 2010, ch. 59, § 2(E). Effective June 14, 2019, the legislature updated the standards:

> School districts and charter schools shall train school administrators and teachers who teach reading to implement appropriate evidence-based reading interventions. School districts and charter schools shall train special education teachers to provide structured literacy training for students who are identified with dyslexia as a specific learning disability and who are eligible for special education services.

N.M. Stat. § 22-13-32(F) (2019). Therefore, D.A.'s fourth grade teacher (2018–19 school year) is bound by the earlier standard beginning from the start of the statutory period (October 8, 2018), while his fifth and sixth grade teachers (2019–2020 and 2020–21 school years, respectively) are bound by the updated standard through the end of the statutory period (October 8, 2020).

D.A.'s fourth and fifth grade special education and SPIRE teacher, Ms. Hurd, has received no specialized training regarding dyslexia whatsoever. DPH Transcript at 504.[23] His sixth grade special education SPIRE teacher, Mr. Ross, was not trained in SPIRE when he began teaching it; he still had not completed the final day of SPIRE training at the time of the hearing in January. *Id.* at 688.[24] Mr. Payne, D.A.'s educational assistant for sixth grade, has not received any SPIRE training and does not help D.A. with SPIRE work. *Id.* at 797.[25] The DPHO held that "APS failed to ensure that Student's teachers had the professional training, professional development, and

---

[23] Doc. 18 at 795.
[24] Doc. 18 at 979.
[25] Doc. 18 at 1088.

oversight throughout the school year, to ensure that they had the capacity to provide the instruction Student required to enable him to make progress appropriate in light of his circumstances." (Doc. 1-1 at 43). The Court agrees and therefore **AFFIRMS** the DPHO's decision regarding Issues Number 3 (D.A. was not provided education which met state standards) and 13 (the IEP teams did not have specialized expertise in dyslexia and reading instruction).[26]

### D. Supplemental Tutoring

APS notes "the confusion wrought by three different teachers teaching three different reading programs at three different intervals and times." (Doc. 15 at 4–5). This statement references the fact that D.A.'s parents "have elected to provide [him] with outside reading services from not only one individual but two, each utilizing a different reading program than each other and the District." *Id.* at 5 n.3. Although some testimony in the record exists to indicate that multiple concurrent reading programs "could" have an adverse impact on a child's learning, *see* DPH Transcript at 1156–57,[27] the Court does not follow APS's leap that because Parents sought supplemental outside tutoring, APS is somehow absolved of its duty to address D.A.'s poor reading skills. APS cites no authority for this proposition, and the fact that multiple reading programs "could" impact a child's learning does not demonstrate that they did in this case.

## II.     D.A.'s Attendance Record

APS argues that D.A.'s "sporadic attendance had an adverse impact on [his] progress." (Doc. 15 at 9). It asserts that it brought evidence "that showed [D.A.] had missed 26 classes out of 36 and in another instance attended only 1 out of 6 classes." *Id.* at 10. It also claims that D.A. missed class, logged in late, left early, or was pulled out of class for outside services frequently

---

[26] As to Issue Number 13's claim that the IEP teams did not have specialized expertise in Assistive Technology services, the Court also affirms this finding below when it discusses Assistive Technology.
[27] Doc. 18 at 1447–48.

enough to impede his learning notwithstanding the adequate plan APS put in place. *Id.* at 10–11. APS relies heavily on *Garcia v. Albuquerque Public Schools*, 520 F.3d 1116 (10th Cir. 2008).[28]

In *Garcia*, the student in question was a high schooler during the period that resulted in an IDEA challenge. 520 F.3d at 1120. During her first year of high school, she frequently skipped class, "began to engage in significant drug and alcohol use," and spent the spring semester of ninth grade in juvenile detention and treatment centers based on an arrest and adjudication for attacking her mother and brother. *Id.* After the student's release, she was re-enrolled in the ninth grade for Fall 2003, but the school did not review, revise, or update her IEP, which led to an IDEA challenge. *Id.* She "continued to exhibit serious disciplinary problems," including sixty-five unexcused absences and a suspension for fighting in school. *Id.* at 1121. The DPHO found for the district;[29] the administrative appeals officer ("AAO") reversed. *Id.*

The student's mother appealed this decision in federal court, "claiming that the AOO should have found further violations of IDEA and that the compensatory education awarded by the AAO was insufficient." *Id.* The district court found for the school district, reasoning—as the original DPHO had—that it was the student's behavior that caused the loss of educational opportunity, not the school's procedural failings. *Id.* The district court also held that even if the school was liable under the IDEA, compensatory educational services were not warranted in equity given the student's repeated failure to take advantage of the opportunities provided to her. *Id.*

---

[28] The undersigned judge is very familiar with the *Garcia* case; he presided over the case at the district court level.
[29] The *Garcia* DPHO's decision included the statement, "[a] school cannot provide FAPE to a student who is not there, either physically or by virtue of her attitude." *Id.* at 1121 (citing DPHO's final decision). APS incorrectly, and without a pincite, states that this quote is a finding of the *Garcia* court. (Doc. 22 at 3). This quote is a finding of the DPHO—who was then appealed to the AAO, who was then appealed to the district court, who was *then* appealed to the Tenth Circuit, which may fairly be called the *Garcia* court given that it is the Tenth Circuit holding that APS cites. The Tenth Circuit uses this quote only in describing the procedural history of the case and outlining the holdings of various officers and courts at each stage of the litigation. *See* 520 F.3d at 1121. This quote is not a statement by the *Garcia* court itself.

The student's mother appealed to the Tenth Circuit, which *expressly declined* to answer the question of whether a student's behavior can "defeat the school district's liability under IDEA." *Id.* at 1127. Then-Judge Gorsuch mused in dicta that on one hand, the implicit question is whether the school district "*caused* the student to suffer an educational loss"—suggesting that a student's poor behavior causing her own loss could be relevant—but on the other hand, "a student's lack of enthusiasm, at least in some cases, may be related to his or her disability" and that "[s]uch students are perhaps most in need of vigilant attention from their schools." *Id.* The case explicitly turned on narrower grounds: whether the district court abused its discretion in denying equitable relief to the student based on her behavior. *Id.* The Tenth Circuit held that "we cannot say that the [district] court abused its discretion," but went on to clarify that "this is not to say that, were we making a decision in the first instance, we would necessarily choose the same path the district court took here; neither do we believe that the district court's path was the only one available to effect the statutory purposes of IDEA." *Id.* at 1130.

The Court today employs such detail in outlining *Garcia*'s narrow holding precisely because the Tenth Circuit took pains to craft a detailed, narrow holding. The Tenth Circuit held that it is not an abuse of discretion for a district court to deny equitable relief in the form of compensatory education to a student whose behavior has indicated that the student would be unlikely to benefit from it. It did not hold that a student's poor behavior can defeat a school district's obligation to provide a FAPE, or even hold that a student's poor behavior automatically precludes equitable relief. Withholding equitable relief is one option within a court's discretion in the case of extreme instances of truancy and disciplinary problems—not necessarily, as the Tenth Circuit plainly states, the best or only way a court ought to handle the matter. *See id.* at 1130; *see also Preciado v. Bd. of Educ. of Clovis Mun. Schs.*, 443 F. Supp. 3d 1289, 1308 (D.N.M. 2020)

("*Garcia*'s discussion about whether a court may consider the effect of a student's own actions on her education is dicta clearly labeled as such."). Students with disabilities require individualized attention, not broad-strokes rules that will punish their low attendance no matter the cause. *See Endrew F.*, 137 S. Ct. at 1001 (IDEA requirements "resist" efforts to generalize).

The facts in this case are also decidedly different from those in *Garcia*. In fact, the DPHO firmly distinguished *Garcia* from the present matter. (Doc. 1-1 at 50). Indeed, the evidence of D.A.'s absences is inconclusive; his absences take place in an educational context not contemplated by *Garcia*.

To begin, it is clear from the record that D.A. was absent frequently from his online courses after the onset of the COVID-19 pandemic. *See* DPH Transcript at 523, 610–611, 624–25, 696–97, 763–64, 769, 831, 848, 1127–28;[30] Doc. 19 at 121, 125–27. However, the pandemic itself and the switch to online learning led to difficulties in recording attendance. *See* DPH Transcript at 696–97 ("last semester" [Fall 2020] teachers took attendance only once per week and the new system was "confusing"), 766 (difficulty in assessing attendance), 774 ("APS changed the format for attendance" and there was no adequate method of taking attendance prior to holiday break), 775 (pandemic and online format of classes has made instruction difficult for students, parents, and teachers, which led to school schedule changing in January to decrease online time), 789 (other children in class also do not attend sometimes), 856 (teachers do not record tardy attendance and "there's no such thing as a tardy this school year" [2020–21]), 1128 (school's method of taking attendance was "inconsistent and poor" during the first semester [Fall 2020]).[31]

D.A.'s absences were far more limited during elementary school. *See* Doc. 19 at 141 (seven absences in kindergarten, twelve in first grade, four in second grade, three in third grade, and two

---

[30] Doc. 18 at 814, 901–02, 915–16, 987–88, 1054–55, 1060, 1122, 1139, 1418–19.
[31] Doc. 18 at 987–88, 1057, 1065, 1066, 1080, 1147, 1419.

in fourth grade). Furthermore, D.A.'s attendance issues in middle school appear related to his disability—whether because he struggled to log onto class due to his reading issues, because he avoided English Language Arts ("ELA") class, or because he left ELA class to obtain private tutoring. *See* DPH Transcript at 523 (D.A. "did not attend very many language arts classes" but attended more math), 769 (D.A.'s attendance is less of a problem in other courses than in reading), 831 (D.A.'s attendance and participation improved when provided an educational assistant), 845–47 (D.A. struggled to access online study skills class because voice-to-text assistive technology did not recognize password); 850–51 (math teacher attributed low attendance to D.A.'s frustration and inability to access online class); 992 (D.A. left class two to three times a week to attend therapy);[32] Doc. 19 at 125 (D.A. unable to attend ELA classes due to private tutoring).

These facts are a far cry from *Garcia*, where the student's nonattendance and disciplinary issues were pervasive and no pandemic or other fundamental change in schooling could fairly be said to have made attendance uniquely difficult. D.A. certainly had many absences—though the exact number is unclear given pandemic-related reporting issues—but they appear to be attributable to the transition to online learning, they have occurred with more frequency during ELA class, and the situation improved when D.A. was provided an assistant. The Court declines to release the school from its responsibility to provide a FAPE to a student whose disability makes it particularly challenging or frustrating for him to attend his online courses regularly.

### III.    Assistive Technology

The DPHO partially granted Parents' claims regarding Issue Number Four (pertaining to assistive technology). (Doc. 1-1 at 49). She stated that Parents proved by a preponderance of the evidence "that the District has failed to provide and continues to fail to provide Bookshare," but

---

[32] Doc. 18 at 814, 1060, 1122, 1136–38, 1141–42, 1283.

not the other assistive technologies, Learning Ally and Snap&Read. Based on the Bookshare

issues, the DPHO also granted Parents' claims regarding Issues Number Six and Seven (pertaining

to APS's timely and consistent provision of assistive technology and whether D.A. used that

technology in the manner he was instructed). *Id.* at 49–50. She stated that "the District has failed

to provide timely and consistent Assistive Technology to meet unique needs, despite good faith

efforts by Student to utilize the technology as directed." *Id.* at 49.

APS argues that it provided D.A. with the equipment necessary for distance instruction and

that "the Assistive Technology staff trained the parents on the use of the equipment and software."

(Doc. 15 at 13). The remainder of its argument in this section takes issue with D.A.'s environment

during remote learning; APS points out that D.A. and his siblings accessed remote learning from

a location with his siblings that "was not his home or with his parents in attendance" and that based

on his "erratic participation" in school, "no one in the home" was supervising D.A. adequately

throughout the school day. *Id.* at 13.

To dispose quickly of the argument pertaining to D.A.'s learning environment, the Court

notes that D.A.'s grandmother—a former Bandelier Elementary School principal—supervised him

and his siblings while they participated in remote learning at her home, one block away from

D.A.'s home. (DPH Transcript at 970, 998).[33] At-home learning is not always ideal, but the Court

sees nothing uniquely concerning about students participating in remote learning from a

grandparent's home. APS provides no evidence that D.A.'s learning environment was the source

of his academic struggles, which began before the pandemic, nor does it cite to any authority

suggesting that a school district may relieve itself of its obligations to provide students a FAPE

---

[33] Doc. 18 at 1261, 1289.

because virtual learning has brought forth unprecedented educational challenges. In fact, APS does not even reference its assistive technology argument on reply. *See generally* Doc. 22.

With that tangential issue now disposed of, the Court turns to the main question: whether APS provided D.A. with the necessary assistive technology and instruction on its use. According to D.A.'s fifth grade IEP, he had assistive technology needs including "a portable writing device with assisted writing and reading tools" that was "available to him for 100% of his academic day." (Doc. 19 at 33). The IEP also stated, "Membership in Bookshare for online rights to Accessible Instruction Materials is recommended." *Id.* at 33, 41. Testimony from the hearing indicates that D.A. was not always provided the assistive technology described in his IEP. *See, e.g.,* DPH Transcript at 116 (assistive technology available in special education classes but not always in regular education classes), 120 (Bookshare sponsor is "someone at the school that knows how to upload books for students to their digital devices"), 122 (Ms. Muller, the Assistive Technology Provider, never uploaded books into Bookshare for D.A. in fifth grade and "[did not] recall that he was using Bookshare"), 142 (Ms. Muller did not provide D.A. any audio texts through Bookshare in sixth grade); 158 (Ms. Muller inquired about whether other teachers needed textbooks uploaded to Bookshare and never received a response), 501–02 (D.A.'s sponsor teacher "struggled with Bookshare" and had "difficulty in finding the texts, loading the texts").[34]

Certainly, D.A. may not always have chosen to use his technology to its full extent, and testimony indicates that some training did occur. *See* DPH Transcript at 120 (D.A. received a minimum of 180 minutes of instruction in how to use assistive technology in fifth grade), 124–25 (D.A. was not using his Chromebook "as much as [Ms. Muller] expected" because D.A. did not want to use his device in a general education classroom where other children were not using

---

[34] Doc. 18 at 407, 411, 413, 433, 449, 792–93.

devices), 129 (Ms. Muller gave handouts to D.A.'s parents on October 24, 2019 regarding use of Chromebook), 130 (D.A. used tools well in Fall 2019 and early Spring 2020 before pandemic, but did not want to bring Chromebook into general education classroom), 139–40 (D.A. had C-scan pen during online learning, which assisted with reading at home during the pandemic), 141 (Ms. Muller met with D.A. "several times on a Google Meet" to discuss use of his technology), 151–52 (Ms. Muller testifies that "no kids feel comfortable using [assistive devices] in front of other kids" because of reluctance to stand out from peers), 165 (C-scan pen accomplished same goal as Bookshare), 974 (mother indicates reader pen is not helpful and D.A. does not use it at home).[35]

However, this shyness on D.A.'s part and the training offered by APS staff regarding other devices does not minimize the seriousness of D.A.'s lack of access to Bookshare. Indeed, even the reader pen—which read text aloud, accomplishing the same task as Bookshare would—only became a part of D.A.'s IEP in April 2020. (Doc. 19 at 55). But Bookshare was mentioned on D.A.'s IEP as early as August 2019, the start of his fifth-grade year. *Id.* at 41. This timing means that from August 2019 to April 2020, at a minimum, D.A. did not have consistent access to audio versions of his coursework. His fifth-grade teacher indicates that she or one of D.A.'s classmates "would read for [D.A.]" in class so he could participate. DPH Transcript at 429.[36] He had a Chromebook that could read text aloud, but he acquired it later in the year; it was not available from the start. *Id.* at 430.[37] The preponderance of the evidence indicates that the school failed to provide adequate Bookshare access during D.A.'s fifth grade year.

Accordingly, the Court **AFFIRMS** the DPHO's decision regarding Issues Numbers 4, 6, and 7 as they pertain to Bookshare. The Court also **AFFIRMS** the DPHO's decision regarding

---

[35] Doc. 18 at 411, 415–16, 420, 421, 430–31, 432, 442–43, 456, 1265.
[36] Doc. 18 at 720.
[37] Doc. 18 at 721.

Issue 13 to the extent that it pertains to the IEP team's lack of specialized expertise in Assistive Technology services. *See* Doc. 1-1 at 54.

## IV.   Denial of a FAPE

For the reasons stated above, given the Court's decision to affirm the DPHO's findings of fact, the Court finds that APS denied D.A. a FAPE with regard to reading. The education that APS provided to D.A., with all its irregularities, lack of access to appropriate technology, untrained instructors, and lack of fidelity to the SPIRE program, is not "reasonably calculated to enable [him] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999. Indeed, the record demonstrates that D.A. is a "bright" child who is capable of learning but has had his educational goals continually thwarted by educators lacking proper training and support who therefore have not implemented the SPIRE program with fidelity. *See* DPH Transcript at 32, 58, 329 (describing D.A. as bright).[38] The DPHO has outlined remedies appropriate to address the damage caused by deprivation of a FAPE in reading during the statutory period. The Court therefore **AFFIRMS** the DPHO's decisions regarding Issues Number 14 and 15.

## V.   Writing, Spelling, and Math

The DPHO did not find denial of a FAPE for writing or spelling separate from the denial of a FAPE for reading, but she did note that the failure to create writing goals is a procedural violation to be remedied in future IEPs.[39] The record indicates that D.A. did not receive writing or

---

[38] Doc. 18 at 323, 349, 620.

[39] The DPHO refers to 34 C.F.R. § 300.513(a)(4), which does not exist. The Court believes this to be a typographical error in which she intended to refer to § 300.513(a)(3). This provision allows only for remedies based on a listed set of procedural requirements, which does not appear to include the failure to create necessary IEP goals. *See* 34 C.F.R. § 300.513(a)(3). However, case law indicates that courts may remedy IDEA violations not resulting in denial of a FAPE through prospective relief or other equitable means. *See Garcia* at 1125–26; *Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1120 n.4 (10th Cir. 1999). An IEP must contain "a statement of measurable annual goals" that are "designed to . . . enable the child to be involved in and make progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(II). Therefore, failing to include such a statement is an IDEA violation even if it does not result in denial of a FAPE, and the above case law permits prospective equitable relief.

spelling goals in his IEP despite consistently struggling with these subjects. *See generally* DPH Transcript at 174 (spelling struggles),[40] Doc. 19 at 8, 21, 35, 49, 63 (IEPs do not contain writing or spelling goals); *but see id.* at 76 (writing goal included in IEP for sixth grade). The DPHO ordered that future IEPs contain writing goals; the Court agrees with this conclusion and therefore **AFFIRMS** the DPHO's finding as to Issue Number Eight (IEP goals not designed to meet D.A.'s needs) and the appropriate remedy. *See* Doc. 1-1 at 48, 56 (requiring goals regarding progress in "all aspects of writing").

The DPHO found denial of a FAPE for math but did not believe it warranted compensatory education. (Doc. 1-1 at 48). The record shows that D.A. was placed in general education math classes in sixth grade even though testing indicated his math skills were at a fourth-grade level, and that for the first nine weeks of sixth grade he had a D- in math. DPH Transcript at 745–46, 752–53;[41] Doc. 19 at 215. Because D.A.'s sixth grade IEP removed him from special education math classes, the school did not fail to meet his IEP as the DPHO contends because the IEP contained no specialized math requirements that the school failed to provide. *See* Doc. 1-1 at 46.

However, the DPHO correctly observes that the sixth grade IEP characterizes D.A. as having a learning disability that "interfere[s] with his ability to perform up to grade level standards in . . . math calculation." Doc. 19 at 75; *see* Doc. 1-1 at 46. Accordingly, by failing to include math support in the IEP and providing no explanation as to why D.A.'s fourth-grade-level math skills justified placement in a sixth-grade general education setting, the school violated the IDEA's requirement to include "a statement of the special education and related services . . . to be provided to the child . . . to be involved in and make progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Special education support was necessary for D.A. to be involved

---

[40] Doc. 18 at 465.
[41] Doc. 18 at 1036–37, 1043–44.

in the general education math curriculum, but the sixth IEP did not provide for it; D.A.'s math education was not appropriate for his academic level, so he did not receive a FAPE. Although this violation does not require compensatory education as a remedy, the Court agrees with the DPHO's prospective order to increase inclusion support for D.A. in his general education math class going forward to comply with the requirements of the IDEA. *See* Doc. 1-1 at 48.

In summary, while certain minor details are incorrect as noted above, the Court affirms the DPHO's ultimate conclusions on each issue as well as the DPHO's decision regarding a remedy.

**IT IS SO ORDERED.**

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE